J-A11009-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2628 EDA 2021 |

Appeal from the Decree Entered November 16, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000302-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: H.T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2629 EDA 2021 |

Appeal from the Decree Entered November 16, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000303-2020

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:                    **FILED JULY 15, 2022**

In these consolidated cases, T.W. ("Father") appeals from the November

16, 2021 decrees involuntarily terminating his parental rights to T.A.W., born

in March 2017, and H.T.W., born in July 2018.  We affirm.[1]

---

[1] DHS's petitions also sought to terminate the parental rights of Y.W.-J ("Mother").  The court granted the petitions as to Mother, whose appeals are listed before this panel at 2581 EDA 2021 and 2583 EDA 2021.

We begin with an overview of the relevant facts and procedural history. Philadelphia Department of Human Services ("DHS") became involved with the family following H.T.W.'s birth when H.T.W. and Mother tested positive for marijuana. N.T., 11/16/21, at 12-13. Father was present at H.T.W.'s birth and participated in parenting alongside Mother. *See id*. at 15, 113, 214. During DHS's initial involvement, the family remained intact but there was "a lot of domestic violence between [M]other and [F]ather." *Id*. at 15.

DHS provided services to the family through a Community Umbrella Agency ("CUA"). *Id*. at 13. After several months of involvement with the family, DHS filed a petition to adjudicate T.A.W. and H.T.W. dependent pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6301 – 6375. On September 19, 2018, the trial court adjudicated T.A.W. and H.T.W. dependent, but permitted T.A.W. and H.T.W. to remain in Mother's legal and physical custody under DHS supervision. N.T., 11/16/21, at 13.

On October 11, 2018, Father pleaded guilty to the misdemeanor crime of retail theft in Montgomery County, Pennsylvania, and was sentenced to two years of probation. *See id*. at DHS Exhibit 23. Then, at some point in 2018 that is not clear from the record, Father was arrested and incarcerated. *Id.* at 108-09.

While Father was incarcerated, Mother absconded with T.A.W. and H.T.W. to Syracuse, New York. *Id*. at 86. On December 9, 2018, DHS located T.A.W. and H.T.W. and removed them from Mother's care pursuant to an order

of protective custody. *See id*. at 23-24; *see also id*. at DHS Exhibits 5-7. DHS placed T.A.W. and H.T.W. into foster care. *Id*. at 124, 145. Originally, the children were in separate foster homes, but in November 2019, T.A.W. moved into H.T.W.'s foster home. *Id*.

Father was released from jail in 2019, approximately six to eight months after he was incarcerated in 2018. *Id*. at 109. After his incarceration, he worked as a mason in another county. *Id*. Other than making a few unauthorized appearances at Mother's visits, attending several drugs screens, and attending a dependency court hearing, he did nothing to participate in the dependency case after his release. *Id*. at 47-52, 92-96, 100-11. In 2020, Father was arrested in Cambria County and jailed for violating his Montgomery County probation. *See id*. at 109, DHS Exhibit 23. At the time of the termination of parental rights hearing, he remained incarcerated.

Meanwhile, T.A.W. and H.T.W. remained with the same pre-adoptive foster family. On September 8, 2020, DHS filed petitions to terminate involuntarily Father's parental rights to T.A.W. and H.T.W. pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). The trial court conducted a hearing on DHS's petitions on November 16, 2021.[2] Relevant to Father's

---

[2] At the time of the hearing, T.A.W. was age four and H.T.W. was age three. Shannon Sherwood, Esquire represented T.A.W. and H.T.W. as guardian *ad litem*. Meredith Rogers, Esquire, represented T.A.W. and H.T.W. as legal counsel. Father was represented by court-appointed counsel, Lue Frierson, Esquire.

case, DHS presented the testimony of James Allen, the family's assigned CUA case manager, and introduced without objection three drug screens and a summary of Father's criminal history.[3]  N.T., 11/16/21, at 8.  Father testified on his own behalf.  At the close of all testimony, the trial court terminated Father's parental rights pursuant to § 2511(a)(1), (a)(2), and (b).

Father timely filed the instant notices of appeal concurrently with concise statements of matters complained of on appeal.  In lieu of an opinion pursuant to Pa.R.A.P. 1925(a), the trial court directed this Court to the rationale it articulated on the record at the close of the November 16, 2021 hearing.

_____

[3] The criminal history was current only to the date DHS filed the petition to terminate Father's parental rights.  *See* N.T., 11/16/21, at DHS Exhibits 23, 26.  Thus, the only evidence in the record regarding any potential release date was Father's testimony that he "should be coming home" in January 2022.  *Id*. at 98.  It is unclear whether that release date was realistic or merely reflective of Father's optimism, as the criminal record introduced by DHS indicated Father was facing two sets of charges in September 2021.  *See id*. at DHS Exhibit 23.  At the hearing, Father testified that he was "locked up" for driving without a license and "other things."  *Id*. at 109.  Potentially, the "other things" referenced by Father were a set of drug-related felony charges and a set of charges including driving under the influence.  *Id*.  However, nothing in the record indicates the disposition of the charges, and the trial court noted that it had "no reason not to find him credible" on his release date.  *Id*. at 263.

- 4 -

Father raises one issue on appeal: "Did the [t]rial [c]ourt err in terminating [Father's] parental rights under 23 Pa.C.S.A. Sections 2511(a)(1), (a)(2) and 2511(b)?" Father's brief at 4.[4]

In reviewing this issue, we bear in mind the following well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to

---

[4] We note with disapproval that the children's legal counsel neglected to file a brief in this Court.

- 5 -

trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, *supra*, at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, *supra*, at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.*, *supra*, at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, *supra*, at 359 (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *C.M.*, *supra* at 359; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under subsection 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa.Super. 2021). If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then

must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

This Court need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We focus our analysis on § 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To prove the existence of grounds pursuant to § 2511(a)(2) by clear and convincing evidence,

> the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*Interest of D.R.-W.*, 227 A.3d 905, 912-13 (Pa.Super. 2020) (citation omitted).

Subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, *supra* at 1117. "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa.Super. 2021). With respect to incarcerated parents, our Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." *In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012) (citation and internal quotation marks omitted). "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind ... that the child's need for consistent parental care and stability cannot be put aside or

put on hold." ***Interest of K.M.W.***, 238 A.3d 465, 474 (Pa.Super. 2020) (*en banc*) (citation omitted).

Once the trial court has determined that the petitioner met its burden under § 2511(a), it then must shift its focus to the child. ***T.S.M.***, ***supra*** at 267. To that end, the Adoption Act provides, that the court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.§ 2511(b).

The "emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." ***T.S.M.***, ***supra*** at 267 (citation and quotation marks omitted). Our Supreme Court has made clear that section 2511(b) requires the trial court to consider the nature and status of bond between a parent and child. ***In re E.M.***, 620 A.2d 481, 484-85 (Pa. 1993). Existence of a bond does not necessarily result in denial of a termination petition. ***T.S.M.***, ***supra*** at 267. Instead, the court must examine the effect on the child of severing such bond. ***Id***. "When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" ***In re Adoption of J.N.M.***, 177 A.3d 937, 944 (Pa. Super. 2017) (quoting ***E.M.***, ***supra***, at 484-85).

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one

of many factors to be considered by the court when determining what is in the best interest of the child." ***In re M.M.***, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." ***Id***.

Father argues that the trial court erred in terminating his parental rights under § 2511(a)(2) because he has plans to live with his mother when he is released from prison; he has attended mental health therapy and had employment in the past; and he completed a drug and alcohol abuse program. Father's brief at 12. According to Father, DHS did not produce evidence that he could not remedy his alleged incapacity, abuse, neglect, or refusal. ***Id***. He maintains the trial court erred in terminating his parental rights under § 2511(b) because he visited T.A.W. and H.T.W. virtually when he could and he has a loving relationship with the children, which benefits them. ***Id***. at 14.

The trial court offered the following explanation of its decision to terminate Father's parental rights pursuant to § 2511(a)(2) and (b). The court found Father demonstrated a pattern of incarceration, noting that he was incarcerated when DHS placed T.A.W. and H.T.W. into foster care, released, and incarcerated again. N.T., 11/16/21, at 263. The court observed that Father knew he had objectives but remained unconvinced after his

testimony that he did anything affirmative to parent the children or remedy the issues leading to his recurrent pattern of incarceration. *Id*. at 264.

The court stressed that T.A.W. and H.T.W. have been in foster care for most of their lives, compared to very limited contact with Father. *Id*. at 264-65. In the court's view, his short sporadic interactions on the phone during Mother's visits did not constitute a meaningful visit for Father, and as a result he has no bond with T.A.W. and H.T.W. and did not maintain a place of importance in their lives. *Id*. at 265. In Father's absence, T.A.W. and H.T.W. bonded to their foster parents and have stability with them. *Id*. at 265-66.

After reviewing the record, we conclude it supports the trial court's findings. During the two years T.A.W. and H.T.W. were in foster care, Father was incarcerated on two separate occasions, rendering him unavailable to parent T.A.W. or H.T.W. But even during the periods he was released, Father did not attempt to reunify with T.A.W. and H.T.W. Based on concerns generated during its early involvement with the family, CUA referred Father to a domestic violence program, mental health services, and a substance abuse assessment. Mr. Allen rated Father's compliance with his objectives as "none." *Id*. at 54. Father did not avail himself of these referrals or otherwise participate in such services. N.T., 11/16/21, at 16-17, 52-53.

Specifically, despite Father's claim in his brief that he participated in mental health services, nothing in the record supports his assertion, not even his own testimony. Father refused to acknowledge domestic violence between

him and Mother despite getting into altercations outside the courtroom after hearings. *Id*. at 15. Father claims he did not know that he needed to complete a domestic violence program at Menergy, but Mr. Allen, whom the trial court found to be credible, testified that CUA reminded Father about the requirement on at least three occasions. *Id*. at 17. Father attended only four court-ordered screens, and all were positive for cannabis and/or amphetamines. *Id*. at 16-17; *see also id*. at DHS Exhibits 10-12, 17. Father scheduled a substance abuse assessment but did not appear or provide notice that he was not going to appear. *Id*. at DHS Exhibit 17. Father claimed he "passed" a drug program that was a "NA/AA type of program" at an unnamed provider, but he did not "turn [his certificate of completion] in." *Id*. at 94.

Father's testimony underscored his refusal to work towards reunification. Father admitted that he knew T.A.W. and H.T.W. were in foster care. *Id*. at 101. Initially, Father claimed that he did not know he needed to take action to reunify with T.A.W. and H.T.W. *Id*. at 95. As he phrased it, "I assumed that, due to the fact that I was incarcerated when the children was took [*sic*], that I really was not a part of the matter." *Id*. at 104. Yet Father also acknowledged that he attended a court hearing in the dependency matter while he was out of jail. *Id*. at 101. Father then admitted that he "did know that the court order did order a few things." *Id*. at 104. He explained that he had "felt like, all right, that's me. On my time, I can do this and get the children." *Id*. He further attempted to justify his inaction by claiming an

unnamed CUA worker told him Mother would get T.A.W. and H.T.W. back before him even if he completed his objectives. *Id*.

Most egregiously, Father has only had sporadic contact with T.A.W. and H.T.W. throughout their young lives. Father's visits were court-ordered to occur at DHS, but he never availed himself of visits at that location. *Id*. at 49. Instead, on several occasions, Father made unauthorized appearances during Mother's visitations at CUA and Family School. *Id*. at 48; *see also id*. at DHS Exhibit 8. When CUA told Father he was not permitted to visit because the court had restricted his visits to DHS only, Father became aggressive. *Id*. at 48. On one of these attempted visits, Father brought sneakers, clothes, and toys, and the children began looking at the gifts he brought and tried on the sneakers. *Id*. at 49. After CUA told Father he had to leave, he took the gifts away from the children and left. *Id*. These attempted visits in 2019 were the last time Father saw T.A.W. and H.T.W. in person. *Id*. at 50, 81. Although he has been incarcerated since 2020, he has never requested visits at the prison. *Id*.

From Mr. Allen's perspective, neither T.A.W. and H.T.W. have a "positive, healthy paternal relationship" with Father. *Id*. at 77-78. Father has been absent due to incarceration for most of their lives. *Id*. When Mr. Allen started working on the case, T.A.W. referred to him as "dad," and now refers to his resource parent as "dad." *Id*. at 78. Neither child asks about Father or asks to see him. *Id*. at 77, 79. Mr. Allen does not believe T.A.W.

and H.T.W. would suffer "irreparable harm" if Father's rights were terminated. *Id*. at 77-78.

Based on the foregoing testimony, we discern no abuse of discretion nor error of law in the trial court's determination that Father has been and remains unwilling or unable to parent T.A.W. and H.T.W. Father's recurrent incarcerations and inaction outside of prison left a parental void for T.A.W. and H.T.W., and the court was within its discretion to conclude that the extent of his inaction, combined with his deflection of blame, established he was not willing or able to remedy those conditions and be the consistent parent that T.A.W. and H.T.W. needed. As this Court has often emphasized, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." **K.M.W.**, **supra**, at 474 (citation omitted). Thus, the trial court did not err in terminating Father's parental rights pursuant to § 2511(a)(2).

For several of the same reasons, we also discern no abuse of discretion or error of law in the trial court's assessment that the termination of Father's rights satisfied the developmental, physical, and emotional needs and welfare of T.A.W. and H.T.W. due to their lack of bond with Father, positive bond with their foster parents, and need for stability after spending most of their lives in foster care. As highlighted *supra*, Father's contact with the children was infrequent, Father failed to attend any of the supervised visitations scheduled

at the agency, and neither T.A.W. and H.T.W. have a positive paternal relationship with him. N.T., 11/16/21, at 77-78. T.A.W. refers to his resource parent as "dad," neither child asks about Father. *Id* at 77, 78, 79. In fact, and the CUA case manager opined that T.A.W. or H.T.W. would not suffer irreparable harm if Father's parental rights were terminated. *Id*. at 77-78. Accordingly, we conclude that the certified record supports the trial court's needs and welfare analysis pursuant to § 2511(b).

Hence, we affirm the trial court's decrees terminating Father's parental rights under § 2511(a)(2) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2022